## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

SARA D. GOODWILL, individually and
on behalf of all others similarly situated,

      Plaintiff,

v.

ANYWHERE REAL ESTATE INC. f/k/a
REALOGY HOLDINGS CORP.,

      and

THE MASIELLO GROUP LIMITED d/b/a
BETTER HOMES AND GARDENS REAL
ESTATE/THE MASIELLO GROUP,

      Defendants.

CASE NO. 2.22-CV-407-LEW

---

## FIRST AMENDED CLASS ACTION COMPLAINT
---

Named Plaintiff Sara D. Goodwill, by and through her undersigned counsel, files this First Amended Class Action Complaint on behalf of herself and those similarly situated employees of Defendants Anywhere Real Estate Inc. f/k/a Realogy Holdings Corp. ("Realogy") and The Masiello Group Limited d/b/a Better Homes and Gardens Real Estate/The Masiello Group ("BHG/TMG," with Realogy, the "Defendants") for unpaid wages.

## INTRODUCTION

1.    Plaintiff Goodwill and those similarly situated are currently, or were formerly, employed by Defendants as real estate brokers, associate real estate brokers, and/or real estate sales agents (collectively, "Realtors") and were intentionally misclassified by Defendants as independent contractors.

1

2.     Plaintiff asserts claims on behalf of herself and a group of similarly situated individuals who have worked for Defendants as real estate brokers and agents in the State of Maine and who have been misclassified as independent contractors rather than employees, including claims based on (1) unpaid overtime and minimum wage violations under Maine's Minimum Wage and Overtime Law; (2) unfair agreements in violation of 26 M.R.S.A. § 629; (3) failure to pay wages when due in violation of 26 M.R.S.A. § 621-A; and (4) intentional and knowing misclassification in violation of 26 M.R.S.A. § 591-A.

3.     Further, on behalf of herself, Plaintiff asserts claims based on (1) violation of the Maine Human Rights Act and the Age Discrimination in Employment Act, (2) breach of contract, and (3) conversion.

## PARTIES

4.     Plaintiff is an adult resident of Harrison, Maine. Plaintiff worked for Defendants as a licensed real estate broker from March 23, 2017, to September 9, 2019.

5.     Plaintiff brings this action on her own behalf and on behalf of a group of all other similarly situated individuals, including all individuals who work and have worked within the State of Maine for Defendants and their related parties as real estate brokers, associate real estate brokers, and/or real estate sales agents who Defendants misclassified as independent contractors. This class of individuals meets all of the requirements of Rule 23 of the Federal Rules of Civil Procedure.

6.     Defendant Anywhere Real Estate, Inc. f/k/a Realogy Holdings Corp. is headquartered in New Jersey and is a publicly traded corporation that reported revenue of $7.98 billion in 2021 alone. Realogy owns, operates, and franchises an extensive network of real estate brokerage firms under a vast array of well-known trademarks and trade names including Better

Homes and Gardens Real Estate, Century 21, Coldwell Banker, Sotheby's International Realty, Corcoran Group, Sotheby's, ERA Real Estate, and others including but not limited to ZipRealty, ZipLabs, Cartus, Realogy, and Estately.

7.      Defendant The Masiello Group Limited d/b/a Better Homes and Gardens Real Estate/The Masiello Group is a New Hampshire corporation, with a principal place of business in Keane, New Hampshire, registered to do business in the State of Maine as a real estate brokerage agency. Defendant The Masiello Group Limited operates under the Better Homes and Gardens Real Estate brand pursuant to a franchise agreement with Better Homes and Gardens Real Estate, LLC, a wholly owned subsidiary of Anywhere Real Estate Inc.

## JURY TRIAL REQUESTED

8.      Plaintiff requests a jury trial on all claims and issues for which a jury trial is permitted.

## FACTS RELEVANT TO THE CLAIMS OF NAMED PLAINTIFF GOODWILL AND ALL PUTATIVE CLASS MEMBERS

9.      Defendants require their real estate brokers, associate real estate brokers, and real estate sales agents, at the commencement of their employment with Defendants, to execute a so-called Independent Contractor Agreement ("IC Agreement"). Under the agreement and its applicable policies, procedures, and practices, Defendants refer to its real estate brokers, associate real estate brokers, and real estate sales agents as "Realtors."

## DEFENDANTS USE THE INDEPENDENT CONTRACTOR AGREEMENT TO MISCLASSIFY NAMED PLAINTIFF GOODWILL AND SIMILARLY SITUATED REALTORS

10.      The IC Agreement is a contract of adhesion, drafted exclusively by Defendants with no negotiation with the Realtors. Realtors are required to sign the agreement as a condition of employment.

11.    Although the IC Agreement labels the Realtors as independent contractors, pursuant to the IC Agreement Defendants reserve the right to, and do, exercise such significant behavioral, managerial, and financial control over the Relators such that the Realtors are employees rather than independent contractors.

## DEFENDANTS CONTROL AND DIRECT THE WORK OF THE NAMED PLAINTIFF AND SIMILARLY SITUATED REALTORS PURSUANT TO COMPANY-WIDE POLICIES AND THE REALTOR POLICY MANUAL

12.    Defendants employ supervisors and managers who have supervisory responsibility over the Realtors and assign, direct and supervise the Realtors' work.

13.    Defendants require the Relators to comply with all of Defendants' written and unwritten policies, procedures, and directives, or suffer penalties for not doing so.

14.    Upon commencing work for Defendants, Defendants require the Realtors to receive training in Defendants' policies and procedures and in how to conduct their business and transactions, including the use of technology maintained by Defendants.

15.    The IC Agreement that Defendants require its Realtors to sign specifically incorporates by reference, and requires its Realtors to comply with, an employer/employee style "Realtor Policy Manual," which consists of approximately 115 pages of workplace rules, codes of conduct, procedures, performance standards, disciplinary actions, and other workplace policies.

16.    Defendants, pursuant to the terms of the IC Agreement, the Realtor Policy Manual, and related policies, have the means and the right to control the terms and conditions of their Realtors' working conditions, relationship, and performance. Defendants did in fact control the terms and conditions of its Realtors' working conditions, relationship, and performance.

17.    Among other things, the Realtor Policy Manual includes a Code of Ethics and Standards of Practice which Defendants require its Realtors to follow.

4

18.    The Realtor Policy Manual requires Defendants' Realtors to comply with Defendants' standards for performing their jobs and requires Realtors to comply with typical employment-related policies, including but not limited to anti-discrimination and harassment policies, dress code and office appearance policies, a smoking policy, automobile insurance requirement policies, a log-in and log-out policy, an office "floor time" attendance policy, an office coverage policy, required advertising and promotional policies, policies prohibiting the use of personal computers and software, training and meeting policies, and other typical employment related policies and procedures.

19.    Under its anti-harassment policy, the Realtor Policy Manual expressly provides that Defendants' Realtors are permitted to file claims for harassment with the Maine Human Rights Commission, a procedure reserved only to employees, 5 M.R.S. §§ 4553(3-4), 4572:

> Any employee or REALTOR® who believes he or she has been subjected to sexual harassment may call or write to the commission to register a complaint. Any complaint must be filed with the commission. . . .

20.    The Realtor Policy Manual establishes that Defendants have the authority to discipline their Realtors and terminate their working relationship for violation of Defendants' policies, procedures, and practices. The Realtor Policy Manual includes express "Hiring" and "Firing" policies and specifically provides that its Realtors are subject to disciplinary action, up to and including termination of employment, for violation of Defendants' existing and future policies issued and revised at the sole discretion of Defendants.

21.    The Realtor Policy Manual establishes that Defendants provide its Realtors with an office space, supplies, lock boxes, for-sale signs, customer credit reports, network access, an email account, help desk support, and other supplies, materials, and resources necessary for its Realtors

to perform their work. Defendants did supply its Realtors with these business materials and resources.

22.    The Realtor Policy Manual significantly restricts the means, manners, and channels available to Defendants' Realtors to present and promote themselves to the public. Among other requirements, the Realtor Policy Manual requires Defendants' Realtors to use specific signage dominated by Defendants' names, service marks, logos, and other source-identifying indicia, and it specifically prohibits Realtors from identifying themselves as the source of property listings.

23.    Similarly, the Realtor Policy Manual requires Defendants' Realtors to use business cards, forms, and other public-facing materials that prominently display Defendants' names, service marks, and logos in manners that identify Defendants as the source of Realtors' activities.

24.    The Realtor Policy Manual prohibits Defendants' Realtors from using personal websites to promote themselves. Moreover, if Defendants in their sole discretion approve Realtors to adopt a personal website, they must adhere to specifications designed to promote Defendants as the source of the content, specify the complete address and telephone number of Defendants for their own contact details, and identify an office of Defendants as their place of employment (*i.e.*, Defendants require each Realtor to specify one of Defendants' offices as "where you work").

25.    Under the Realtor Policy Manual and in practice, the Realtors' property listings and client files become the property of Defendants, and Defendants retain the authority to (i) source and refer listings and clients to other Realtors; and (ii) absorb ownership and control over property listings, client files, and work product of Realtors for future use to the sole benefit of Defendants.

26.    Under the Realtor Policy Manual and in practice, Defendants assume the sole discretion to determine whether any claims or disputes between Realtors regarding commissions or other claims should be prosecuted, defended, or settled, and Defendants retains the sole

authority to determine the terms and conditions of any compromise or settlement between Realtors.

27.    Defendants appoint designated brokers to act as supervisors over, and to manage, its Realtors. These supervisors control Defendants' Realtors' employment and the way they perform their jobs.

28.    The level of supervision exercised by Defendants' "designated brokers" far exceeds their statutory authority under the Maine Real Estate Brokerage License Act "to exercise a reasonable level of supervision commensurate with level of qualification and experience of agency employees . . . ." 32 M.R.S.A. § 13179.

29.    The Maine Real Estate Brokerage License Act expressly contemplates and acknowledges that as real estate brokers, associate real estate brokers, and/or real estate sales agents and other agents of agencies such as Defendants may be considered "employees."

30.    Defendants' supervisors controlled the day-to-day activities of Plaintiff—and, on information and belief, other Realtors—in many ways, including but not limited to (i) demanding repeated personal meetings to discuss ongoing client relationships, (ii) providing repeated critical management oversight about routine documents, (iii) repeatedly and directly contacting Realtors' clients about transactions, and (iv) repeatedly directing and counseling Realtors regarding their job performance and asserting managerial control.

31.    Defendants' supervisors required Plaintiff—and, on information and belief, other similarly situated Realtors—to conduct transactions and business in a certain manner, to use social media for business purposes according to its criteria, to be subjected to counseling and criticisms regarding computer and technical skills, mandated specified use of social media such as Facebook, Twitter, Instagram, and other social media platforms, and required Realtors to promote Defendants' trademarks, trade names, and identity as their employer and the source of their work

product.

32.     Defendants' supervisors inserted themselves into the manner and means by which Plaintiff—and, on information and belief, other similarly situated Realtors—communicated and did business with clients and conducted real estate closings and transactions.

33.     Defendants' supervisors reprimanded and counseled Plaintiff—and, on information and belief, other similarly situated Realtors—regarding the way they conducted business and performed their responsibilities.

34.     Defendants' supervisors micromanaged the manner and means by which Plaintiff—and, on information and belief, other similarly situated Realtors—conducted business and performed their responsibilities.

## DEFENDANTS EXERCISE SUBSTANTIAL CONTROL OVER THE HOURS AND PLACES OF EMPLOYMENT OF PLAINTIFF AND SIMILARLY SITUATED REALTORS

35.     Defendants require each of the Relators to work a specified number of unpaid in person, on-site hours each month, referred to as "floor time assignments."

36.     Defendants required Plaintiff and similarly situated Realtors to work these "floor time assignments," which explicitly required Plaintiff and similarly situated Realtors to work in Defendants' designated office during business hours on two to three days per week.

37.     During the floor time assignments, Defendants require their Realtors to be present in the office during the entire period of their assigned floor time shift, to answer telephones on behalf of Defendants, to service walk-ins on behalf of Defendants, and to provide other duties on behalf of Defendants. These duties, including interactions with walk-ins, do not guarantee Realtors any additional commissions because walk-ins and other clients are assigned to a Realtor at the discretion of their supervisor and not based on interactions that took place during floor time assignments.

38.     Further, during the floor time assignments, Defendants required Plaintiff and similarly situated Realtors to perform many tasks that have no bearing on nor contribute in any way to their ability to sell property – the only task for which they are paid. These include, but are not limited to, office management tasks such as daily installation and display of Defendants' office flags and roadside signs that promote Defendants as the source of Realtors' expertise and services, adding paper to the office copier, checking the office temperature and adjusting as needed, making coffee, cleaning bathrooms, and shoveling sidewalks and porches to clear seasonal snow and ice as needed.

39.     Defendants also routinely require the Realtors to attend regular business meetings, trainings, and property tours.

40.     Defendants mandate that Realtors must take all janitorial and administrative steps necessary to maintain a "neat and orderly" appearance for the offices of Defendants, and that Realtors must ensure that their personal vehicles remain "clean inside and out at all times" based on Defendants' stance that personal vehicles of Realtors served as a "second office."

41.     Defendants do not separately compensate its Realtors for the time they spend working floor time assignments, attending required meetings and trainings, or conducting janitorial and administrative duties to the benefit of Defendants. Realtors, including Plaintiff Goodwill, sometimes worked for an entire two-week period during which they performed the above duties, including floor time, for Defendants, but did not receive any compensation for their work.

42.     Through and under the Realtor Policy Manual, Defendants' other policies, procedures, and practices, and Defendants' exercise of control over its Realtors, the Realtors:

> • did not have the essential right to control the means and progress of their work;
>
> • were not permitted to engage in an independently established trade, occupation, profession, or business outside

of their work for Defendants;

• did not have the opportunity for profit and loss as a result of the services they performed;

• were not permitted to, and did not, hire and pay their own individual assistants, as Defendants supplied all of the administrative assistance needed for them to perform their work;

• were not permitted to make their services available to any other client or customer community outside of performing services for Defendants;

• did not have a substantive investment in the facilities, tools, instruments, materials and knowledge used to complete their work;

• were required to work exclusively for Defendants;

• were not held contractually responsible for failure to complete their work; and

• did not perform work that is outside the usual course of Defendants' business.

43.     Defendants direct and control almost every aspect of its Realtors' work, maintain the essential right to control the means and progress of its Realtors' work, and actually control the means and progress of its Realtors' work.

44.     Defendants' Realtors rely primarily and exclusively on Defendants for their economic livelihood.

45.     By its conduct as stated above, Defendants have committed a wide-spread and systematic breach of the terms of the IC Agreement in that it treats the Realtors as employees and not independent contractors as is stated in the IC Agreement.

46.     By its conduct as stated above, Defendants have intentionally and willfully misrepresented to the Realtors that they are independent contractors when in fact they are employees.

47.    Defendants compensate the Realtors through the payment of shared commissions based on real estate transactions with respect to which the Realtors were the listing or selling agent for the transaction.

48.    Defendants do not pay the Realtors on a regular weekly, bi-weekly, or twice monthly basis. Rather, Defendants pay the Realtors only if and when the Realtor is entitled to a commission under the terms of the Realtor Policy Manual.

49.    Under the Realtor Policy Manual, Defendants only pay a commission to the Realtors within five business days after the Relator provides all necessary documentation regarding a transaction to Defendants' finance department.

50.    Under Defendants' commission schedules, Realtors are required to surrender income to Defendants including (i) money used to support brand marketing efforts designed solely to promote trademarks and trade names of Defendants as the source of the Realtors' expertise and services; and (ii) money exchanged between Defendants to satisfy their corporate franchising and licensing agreement obligations.

51.    Defendants do not separately compensate the Realtors for the time they are required to work their assigned floor time assignments each month, for the time they are required to attend required business meetings and trainings, for the time necessary to engage clients, advertise listings, or show properties, or for the time necessary to conduct the janitorial and administrative tasks detailed above.

52.    The contents of the Realtor Policy Manual and practice of the Defendants exhibit expectations that the Relators work more than 40 hours per week performing their various duties as required by Defendants, including but not limited to references that Realtors must work "full time" before they can be considered for benefits and work opportunities above and beyond routine

duties. Defendants have not paid any of the Relators premium overtime pay for work performed over 40 hours per week.

53.    Defendants fail to keep track of, and fail to record, the number of hours worked by the Realtors each week.

54.    Defendants routinely require the Realtors to pay for certain tools of the trade that are primarily for the benefit and convenience of Defendants, without reimbursement, including but not limited to vehicles and their related fuel, maintenance, and insurance expenses, computers, business cards, software access, license fees, stationery and office supplies, mobile telephones, property lockboxes, and advertising Meanwhile, Realtors are prohibited from investing in or contributing to Defendants' facilities, brand promotion, marketing strategies, sophisticated referral and lead generation resources, and other substantive matter dedicated to generating income for Defendants and promoting Defendants as the employer and source of the Realtors' services.

55.    Plaintiff brings this action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of all individuals who worked for, or who have worked for, Defendants as real estate brokers, associate real estate brokers, and real estate sales agents in the State of Maine within the applicable statute of limitations for each count of this Class Action Complaint asserted on behalf of such individuals.

## THE REALOGY ENTERPRISE

56.    Defendant Anywhere Real Estate, Inc., f/k/a Realogy Holdings Corp., ("Realogy") is a publicly owned real estate conglomerate that provides services relating to virtually all aspects of residential and commercial real estate transactions through a complex web of wholly owned subsidiaries and practice groups.

57.    Realogy identifies and advertises itself as "the leading and most integrated provider

of U.S. residential real estate services . . . ."[1]

58.     The services offered by Realogy include franchise, brokerage, relocation, title and settlement, and other services.

59.     According to 2022 filings with the U.S. Securities and Exchange Commission, Realogy operates at least three business segments, including: (1) a franchise group; (2) a brokerage group; and (3) a title group. Realogy owns, operates, and controls these entities through a network of wholly owned subsidiaries and other business entities, which frequently operate as alter-egos of one another and of their related subsidiaries, divisions, groups, and franchises.

60.     Realogy promotes the integrated nature of its business model and services to both the public and its investors. For example, Realogy's 2022 10-K filing states that: "Our complementary businesses and minority-held joint ventures . . . work together, allowing us to generate revenue at various points in a residential real estate transaction, including the purchase or sale of homes, corporate relocation and lead generation services, settlement and title services, and franchising of our brands."[2]

61.     Realogy's franchise group owns, licenses, operates, and/or controls a portfolio of franchise brokerage brands, including Century 21, Coldwell Banker, Coldwell Banker Commercial, Corcoran, ERA, Sotheby's International Realty, and Better Homes and Gardens Real Estate. Each of these individual brands is controlled by one or more wholly owned subsidiaries of Realogy.

62.     Realogy's integrated business model extends to and across its franchised offices and brands.

---

[1] Realogy Holdings Corp. *Form 10-K*. Madison, NJ: Realogy Holdings Corp.; 2022.
[2] Realogy Holdings Corp. *Form 10-K*. Madison, NJ: Realogy Holdings Corp.; 2022.

63.     For example, Realogy operates Anywhere Leads and the Anywhere Leads Network, f/k/a Realogy Leads Group, which is publicly advertised as "a dedicated organization within [Realogy] focused on delivering high-quality, high-converting leads to [Realogy] affiliated brokers and agents across [Realogy's] six residential real estate brands."[3]

64.     Realogy develops and provides training and professional development materials to Realtors across its brands. For example, in 2019, Realogy announced that it was launching a new "Learning Platform" that would be white labeled for each of its brands, stating specifically that the new platform would be especially helpful for "agent recruiting, retention, and productivity."[4]

65.     Realogy also offers a signature year-long training program that is designed and promoted by Realogy, called "Ascend: Executive Leadership Experience." This program is available to Realtors across the Realogy brands and includes sessions on personnel management, covering topics such as recruitment, retention, coaching, and accountability. The program includes in-person activities at Realogy's headquarters in New Jersey.

66.     In addition, Realogy separately recruits and offers training and onboarding programs for individual real estate agents and brokers through its various real estate brands, independent of any franchise agreement or location. For example, Better Homes and Gardens Real Estate publicly advertises training and professional development programs for individuals interested in joining the real estate profession as well as for real estate agents or brokers who are looking to become affiliated with the brand.[5]

67.     Better Homes and Gardens Real Estate is one of the brands operated by Realogy's franchise group through a wholly owned subsidiary of Realogy, Better Homes and Gardens Real

---

[3] https://www.anywhere.re/brands-services
[4] https://www.prnewswire.com/news-releases/realogy-modernizes-agent-and-broker-learning-launches-new-digitally-driven-learning-platform-300947420.html
[5] https://bhgrecareer.com/

Estate, LLC.

68.     Realogy develops the franchise agreements for each of its franchised brands, including Better Homes and Gardens Real Estate. These franchise agreements set the terms and conditions of the franchise ownership model.

69.     Each of these franchise agreements, including the agreements for Better Homes and Gardens Real Estate franchisees, requires franchisees to agree to a "Policy & Procedures Manual," or similar controlling document. Such operative documents include obligations that franchisees must follow as well as brand guidelines, referred to as the brand's "System." This "System" includes policies and procedures for office operations, referrals, programs, sales, management, and education requirements.

70.     Realogy disclaims that the intent of these rules and guidelines is to assert control over its franchisees. But the reality is that these rules do control. In practice, Realogy exerts significant control over the day-to-day operations of its franchisees, including Better Homes and Gardens Real Estate franchises, via the terms and conditions of its franchise agreements. These franchise agreements, and the "Policy & Procedures Manual" that is incorporated by reference into each franchise agreement, are used to control and dictate specific aspects of franchise operations.

71.     Moreover, Realogy retains the right under its franchise agreements, including the Better Homes and Gardens Real Estate franchise agreements, to unilaterally terminate the franchise agreement, which creates significant economic pressure for each franchisee to comply with even those guidelines in the "System" and/or the "Policy & Procedures Manual" that are nominally voluntary. For example, Realogy routinely retains the right under its franchise agreements, including the Better Homes and Gardens Real Estate franchise agreements, to unilaterally terminate the franchise agreement for any reason they deem detrimental to the Better

Homes and Gardens Real Estate brand.

72.    The relationship between Realogy and its individual franchisees, including Better Homes and Gardens Real Estate franchisees, is such that the economic success of each individual franchisee is fully intertwined with Realogy's broader operations. The economic reality is that franchisees cannot operate as a successful business without participation in activities such as training programs, conferences, marketing and business development activities, information sharing, and use of specific proprietary technology, all of which are owned, operated, and/or controlled by Realogy, even where participation in such activities is nominally voluntary.

73.    Individual Realogy franchisees, including Better Homes and Gardens Real Estate franchises, are managed and operated on a day-to-day basis by a Responsible Broker, sometimes also called a Managing Broker or Designated Broker. The Responsible Broker is required to attend orientation and training sessions provided by Realogy. This training covers a range of aspects of business operations, including retention, coaching, and mentoring of Realtors.

74.    Realogy requires franchisees of its brands, including franchisees of the Better Homes and Gardens Real Estate brand, participate in their state's Multiple Listing Service, or MLS, which are privately-owned databases established by cooperating real estate brokers to provide data about properties for sale. This requirement mandates that Realtors follow certain rules of conduct and circumscribes their behavior.

75.    Realogy also requires franchisees of its brands, including franchisees of the Better Homes and Gardens Real Estate brand, comply with the Code of Ethics and Standards established by the National Association of Realtors ("NAR"), a private trade organization for real estate brokers and agents.

76.     Requiring that Realtors comply with the NAR Code of Ethics and Standards effectively necessitates membership in that organization and imposes a disciplinary structure on Realtors. In practice, the requirement that franchisees adhere to the Code of Ethics and Standards established by NAR cannot be satisfied without NAR membership. This, in conjunction with the requirement that franchisees participate in the Multiple Listing Service, means that all Realtors working at any Realogy franchise locations, including Better Homes and Gardens Real Estate franchises, must subject themselves to significant oversight by NAR.

77.     Realogy requires its franchisees of its brands, including franchisees of the Better Homes and Gardens Real Estate brand, to notify Realogy, through Better Homes and Gardens Real Estate LLC, of complaints or disciplinary actions, including from a federal, state, or local licensing or regulatory body. Realogy also requires its franchisees, including Better Homes and Gardens Real Estate franchises, to respond to any Realogy inquiries regarding consumer complaints.

78.     Realogy collects, stores, and transmits information about individual Realtors, including Realtor contact information and data concerning listings, sales, and other transaction information, some of which are provided to Realogy via its wholly owned subsidiaries and franchisees.

79.     Realogy provides an online platform through which consumer complaints about individual Realtors are submitted directly to Realogy. Consumers wishing to submit a complaint select an office location and then a specific agent or broker name from a drop-down menu before providing detail about their issue or complaint. This information is collected by Realogy directly from consumers, and Realogy states that it may share this information with a franchisee.

80.     Realogy also advertises and promotes itself based on the success of its franchisees and the Realtors working for those franchisees. For example, press releases issued by Realogy

announce awards received by individual Realtors and refers to those Realtors with language that highlights their connection to Realogy, such as calling them "Realogy's affiliated agents, owners, and employees" or "Realogy-affiliated leaders."

81.    These activities, taken together, show that Realogy is involved with the management of individual Realtors. In particular, Realogy's tracking of individual Realtor information and performance, together with the level of control that Realogy exerts over the day to day operations of its franchisees, demonstrates that Realogy has direct involvement with the personnel management of individual Realtors.

## THE BHG/TMG – REALOGY RELATIONSHIP

82.    Better Homes and Gardens Real Estate / The Masiello Group ("BHG/TMG") is a franchise operating 35 locations throughout Maine, New Hampshire, and Vermont. BHG/TMG's use of the Better Homes and Gardens Real Estate brand is governed by a franchise agreement with Realogy's wholly owned subsidiary, Better Homes and Gardens Real Estate, LLC.

83.    BHG/TMG is the sole franchisee of the Better Homes and Gardens Real Estate brand in the state of Maine and operates under an exclusive license to use the brand in Maine.

84.    As detailed above, by controlling the terms of the franchise agreement and the Policy & Procedures Manual that is incorporated into the franchise agreement by reference, Realogy exerts both direct control and economic control over the BHG/TMG operation as well as the individual Realtors working for BHG/TMG.

85.    Day-to-day operations of BHG/TMG are heavily intertwined with Realogy and Realogy's products and services. For example, the BHG/TMG website directs users who are facing accessibility issues or who have feedback on the BHG/TMG website's operations to a Realogy help desk and email address.

86.     Press releases and other publicity materials also promote the close relationship between BHG/TMG and Realogy. For example, in 2022, BHG/TMG issued a press release highlighting its receipt of an award from Realogy and its participation in the "Realogy Advantage Network," a Realogy-operated network of brokers and agents.

## FACTS RELEVANT TO THE INDIVIDUAL CLAIMS OF NAMED PLAINTIFF GOODWILL

87.     During the course of Plaintiff's employment with Defendants, Defendants assigned Barbara Howe ("Howe") and others as designated brokers to supervise Plaintiff's work on behalf of Defendants.

88.     Howe and other individuals employed by and acting on behalf of Defendants exhibited discriminatory animus toward Plaintiff on the basis of her age and treated her differently and less favorably than younger Realtors.

89.     Howe repeatedly made direct references to Plaintiff's age in a derogatory manner and made it clear that she did not think Plaintiff could do her job because of her age. Howe repeatedly told Plaintiff during her employment with Defendants that she thought Plaintiff should retire due to her age.

90.     Howe made frequent, age-related comments directed at Plaintiff, including but not limited to "I don't know how you do all this work at your age," "this looks like too much work for you," "don't you think you should retire," and "how much longer can you go on, shouldn't you think about retirement."

91.     When Plaintiff tried to explain to Howe that she had no desire to retire, Howe became angry and made several efforts to fire Plaintiff or force her to quit or retire.

92.     Howe's comments and actions provide direct evidence of Howe's, and Defendants', discriminatory animus based on Plaintiff's age.

93.     Howe further discriminated against Plaintiff on the basis of her age and retaliated against Plaintiff by interfering with Plaintiff's efforts to transfer to another office of Defendants.

94.     On September 2, 2019, Plaintiff began communicating with a broker at a different office of Defendants in an effort to try to relocate to the other office and avoid the hostile and threatening work environment created by Howe. Aware of Plaintiff's strong reputation and extensive contacts in the region, the other broker enthusiastically responded by requesting a meeting with Plaintiff to discuss the opportunity.

95.     Two days later, on September 4, 2019, Howe sent an email to Plaintiff exhibiting further age-based discriminatory animus and stating, "at this time it would be better if you were to step down from full time real estate with us. The process seems to be overwhelming for you at times. . . . Please let me know how you would like to proceed."

96.     On information and belief, Howe also interceded and interfered in Plaintiff's attempt to transfer to the other real estate office. On the same day that Howe informed Plaintiff that she should "step down" because the work "seems to be overwhelming," the broker at the other office abruptly changed his mind about meeting with Plaintiff and informed Plaintiff by email, copied to Howe, that he decided his agency had a full team and that he preferred not to take on another agent.

97.     On September 9, 2019, Defendants terminated Plaintiff's employment on the basis of her age. Howe unilaterally, without informing Plaintiff, returned Plaintiff's real estate license to the Maine Real Estate Commission, thereby preventing Plaintiff from engaging in her profession.

98.     Howe stated that Plaintiff's termination was a decision that she was authorized to make on behalf of Defendants based on her understanding that she was Plaintiff's direct supervisor.

99.     The Code of Ethics and Standards ("Code") incorporated into the IC Agreement by reference specifically prohibits misappropriation of client resources, willful discrimination, and fraud. The Code also prohibits realtors from taking advantage of competitors and making unsolicited comments about others. The Code requires realtors to demonstrate competency, fairness, and high integrity, and admonishes that "No inducement of profit and no instruction for clients ever can justify departure from this ideal." By incorporating the Code into the IC Agreement, Defendants were contractually obligated to comply with these tenets.

100.     In addition, the IC Agreement and the Realtor Policy Manual required Defendants to pay Plaintiff 50% of available proceeds for all pending sales and to pay Plaintiff 25% for reassigned listings.

101.     Instead of compensating Plaintiff as agreed, Defendants took steps to misrepresent the status of Plaintiff's listings by unilaterally withdrawing her listings from the market and then re-listing each under the name of a different agent of Defendants. In addition, Defendants breached obligations under the IC Agreement by reassigning Plaintiff's listings after wrongfully terminating her license.

102.     In addition, on information and belief, Defendants contacted Plaintiff's clients directly, fielded incoming calls for Plaintiff, and promoted false narratives regarding Plaintiff's departure from Defendants. On information and belief, such misrepresentations have included Howe and other agents expressing to clients and others that Plaintiff was incapable of performing her job and/or had voluntarily elected to discontinue her career, and were designed to damage Plaintiff's reputation in order to successfully assume control of her client base and referral network to the benefit of Defendants.

103.    Defendants misappropriated and converted Plaintiff's personal property as well as her clients, client contacts, personal data and emails, and client goodwill and relationships. Defendants maintained that they were entitled to retain, inspect, and collect Plaintiff's personal and professional property, professional business contact information, emails, and client documents upon termination of her employment, and in fact engaged in this misappropriation and conversion.

104.    Howe repeatedly denied requests by and on behalf of Plaintiff to access and retrieve her personal and professional files, materials, and possessions, and refused to allow access until Defendants had collected, reviewed, analyzed, organized, copied, and/or appropriated Plaintiff's personal and professional properties.

105.    Another agent of Defendants, Heather Hanson, acting at the direction of Howe, exceeded permissions by accessing Plaintiff's personal computer and removing and misappropriating Plaintiff's valuable and irreplaceable personal and professional business records including but not limited to client lists, client contact information, and mailing lists including professional records compiled by Plaintiff throughout her career preceding employment with Defendants. Plaintiff did not provide permission for Defendants, Howe, or Hanson to review, access, and convert personal and professional business records in the process.

## ADMINISTRATIVE PROCEDURE

106.    On or about June 29, 2020, Plaintiff filed a timely Complaint of Discrimination with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC") against Defendant BHG/TMG.

107.    On or about June 16, 2022, the MHRC dismissed the Complaint, and the EEOC issued a notice of right to sue with respect to the Complaint.

108.     Plaintiff has exhausted her administrative remedies with respect to all claims requiring administrative exhaustion set forth in this Complaint.

## **RULE 23 CLASS ACTION ALLEGATIONS**

109.     The named Plaintiff Goodwill re-alleges each of the allegations in the paragraphs above, and incorporates the same herein as though set out at length.

110.     The named Plaintiff Goodwill asserts her claims as a class action pursuant to Rule 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure on her own behalf and on behalf of the below defined classes.

111.     This class action is brought on behalf of Plaintiff Goodwill and the putative class members (defined below) to: recover damages, liquidated damages, attorneys' fees and costs for Defendants' failure to pay Plaintiff Goodwill and the putative class members all wages when due and for all hours worked pursuant to 26 M.R.S. §§ 621-A, 626, 626-A and 629.

112.     Defendants injured Plaintiff Goodwill and the putative class members by illegally failing to pay them all wages when due and failing to pay them for all hours worked, in violation of 26 M.R.S. §§ 621-A, 626, 626-A and 629.

113.     Pending any modifications necessitated by discovery, the named Plaintiff Goodwill defines the following classes:

| | |
|---|---|
| **§ 629 Class:** | ALL CURRENT AND FORMER EMPLOYEES OF DEFENDANTS AND THEIR RELATED ENTITIES THAT WORKED AS REALTORS AND WERE NOT PAID FOR ALL WORK TIME. |
| **Overtime Class:** | ALL CURRENT AND FORMER EMPLOYEES OF DEFENDANTS AND THEIR RELATED ENTITIES THAT WORKED AS REALTORS AND WERE NOT PAID OVERTIME WHEN DUE. |

114.    The classes are so numerous that joinder of all potential class members is impracticable. Named Plaintiff Goodwill does not know the exact size of the classes since that information is within the control of Defendants.

115.    The named Plaintiff estimates that the classes contain in excess of three-hundred current and former employees of Defendants. The exact size of each of the classes will be ascertainable from Defendants' records.

116.    There are questions of law and fact common to the classes that predominate over any individual issues that might exist. Common questions of law and fact include: (i) whether Defendants' policies misclassified their Realtors as independent contractors when they were in fact employees; (ii) whether Defendants failed to pay their Realtors for all time worked; and (iii) whether Defendants failed to pay their Realtors all overtime wages when due.

117.    The class claims asserted by the named Plaintiff Goodwill are typical of the claims of all of the potential class members of each putative class. This is an uncomplicated case of unpaid wages that should be mathematically ascertainable from business records and the class claims are typical of those pursued by victims of these violations. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.

118.    The named Plaintiff Goodwill will fairly and adequately protect and represent the interests of each class. She was both an employee of Defendants and was a victim of the same violations of law as other class members.

119.    The named Plaintiff Goodwill is represented by counsel experienced in wage and hour litigation.

120.    The prosecution of separate actions by the individual potential class members would create a risk of inconsistent or varying adjudications with respect to individual putative class members that would establish incompatible standards of conduct for Defendants.

121.    Each class member's claim is relatively small. Thus, the interest of potential class members in individually controlling the prosecution or defense of separate actions is slight. In addition, public policy supports the broad remedial purposes of class actions in general and the pertinent state laws are appropriate vehicles to vindicate the rights of those employees with small claims as part of the larger class.

122.    Named Plaintiff Goodwill is unaware of any members of the putative classes who are interested in presenting their claims in a separate action.

123.    Named Plaintiff Goodwill is unaware of any pending litigation commenced by members of any of the classes concerning the instant controversy.

124.    It is desirable to concentrate this litigation in one forum.

125.    This class action will not be difficult to manage due to the uniformity of claims among the class members and the susceptibility of wage and hour cases to both class litigation and the use of representative testimony and representative documentary evidence.

126.    The contours of the class will be easily defined by reference to payroll documents.

127.    Defendants were legally required to create and maintain, pursuant to the Fair Labor Standards Act and its regulations, including 29 C.F.R. § 516.2 along with analogous law in Maine, detailed payroll records. Notice will be easily distributed as all members of the putative class are or were recently employed by Defendants, who were required to create and maintain records containing the mailing addresses of each such class member.

## CLAIMS FOR RELIEF

Count I: Failure to Pay Overtime—26 M.R.S.A. §664
On behalf of the named Plaintiff and all Overtime Class Plaintiffs
Against All Defendants

128.    The allegations set forth in paragraphs 1 – 127 are repeated and realleged as if fully set forth herein.

129.    Defendants are subject to the requirements of the Maine Minimum Wage and Overtime Law, including the requirement to pay overtime premiums for all hours of work in excess of 40 hours in a given workweek.

130.    As employees, the named Plaintiff and Overtime Class Plaintiffs are entitled to minimum wage and overtime pay under the Maine Minimum Wage and Overtime Law.

131.    Defendants willfully and in bad faith misclassified the named Plaintiff and class Plaintiffs and has failed to pay the overtime pay which is owed to them.

132.    As a result of Defendants' violation of statute and failure to pay overtime wages, the named Plaintiff and class Plaintiffs are entitled to all statutory remedies, including but not limited to unpaid overtime wages, statutory liquidated damages, and attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

Count II: Unfair Agreements—26 M.R.S.A. §629
On behalf of the named Plaintiff and all § 629 Class Plaintiffs
Against All Defendants

133.    The allegations set forth in paragraphs 1 – 132 are repeated and realleged as if fully set forth herein.

134.    By its conduct as set forth above, including but not limited to failing to pay the named Plaintiff and the § 629 Class Plaintiff for performing floor time assignments and attending meetings and training sessions, and by requiring the named Plaintiff and the class Plaintiffs to pay

for tools of the trade that are primarily for the benefit of Defendants, Defendants violated Maine law prohibiting Unfair Agreements, 26 M.R.S. § 629.

135.   As a result of Defendants' violation of the Unfair Agreements Statute, the named Plaintiff and the class Plaintiffs are entitled to all statutory remedies, including but not limited to unpaid wages, statutory liquidated damages, and attorneys' fees and costs pursuant to 26 M.R.S.A. § 626-A.

Count III: Unfair Agreements—26 M.R.S.A. §621-A
On behalf of the named Plaintiff and all § 629
and Overtime Class Plaintiffs Against All
Defendants

136.   The allegations set forth in paragraphs 1 – 135 are repeated and realleged as if fully set forth herein.

137.   By their conduct as set forth above, Defendants failed to pay wages in a timely manner when due in violation of the Maine Timely and Full Payment of Wages Statute.

138.   As a result of Defendants' violation of the Timely and Full Payment of Wages Statute, the named Plaintiff and the class Plaintiffs are entitled to all statutory remedies, including but not limited to unpaid wages, statutory liquidated damages, and attorneys' fees and costs pursuant to 26 M.R.S.A. § 626-A.

Count IV: Misclassification—26 M.R.S.A. §591-A
On behalf of the named Plaintiff and all
Overtime and § 629 Class Plaintiffs Against
All Defendants

139.   The allegations set forth in paragraphs 1 - 138 are repeated and realleged as if fully set forth herein.

140.   By its conduct as set forth above, Defendants intentionally and knowingly misclassified the class Plaintiffs as independent contractors rather than employees. 111. As a result

27

of Defendants' violation of the misclassification statute, the named Plaintiff and the class Plaintiffs are entitled to damages and all statutory remedies including but not limited to civil penalties.

### Count V: Age Discrimination—ADEA
On behalf of the named Plaintiff
Against Defendant BHG/TMG

141.    The allegations set forth in paragraphs 1 – 140 are repeated and realleged as if fully set forth herein.

142. By its conduct as set forth above, BHG/TMG intentionally and willfully discriminated against Plaintiff on the basis of her age in violation of the Age Discrimination in Employment Act ("ADEA").

143. As a result of BHG/TMG's violation of the ADEA, Plaintiff is entitled to all statutory remedies, including but not limited to back pay and front pay, statutory liquidated damages, and attorneys' fees and costs.

### Count VI: Age Discrimination—MHRA
On behalf of the named Plaintiff
Against Defendant BHG/TMG

144.    The allegations set forth in paragraphs 1 – 143 are repeated and realleged as if fully set forth herein.

145.    By its conduct as set forth above, BHG/TMG intentionally and willfully discriminated against Plaintiff on the basis of her age in violation of the Maine Human Rights Act ("MHRA").

146.    As a result of BHG/TMG's violation of the MHRA, Plaintiff is entitled to all statutory remedies, including but not limited to back pay and front pay, compensatory damages, punitive damages, and attorneys' fees and costs.

<u>Count VII: Breach of Contract</u>
On behalf of the named Plaintiff
Against All Defendants

147.    The allegations set forth in paragraphs 1 – 146 are repeated and realleged as if fully set forth herein.

148.    By its conduct as set forth above, Defendants breached their contract with Plaintiff.

149.    As a result of Defendants' breach of contract, Plaintiff has suffered damages.

<u>Count VIII: Conversion</u>
On behalf of the named Plaintiff
Against All Defendants

150.    The allegations set forth in paragraphs 1 – 149 are repeated and realleged as if fully set forth herein.

151.    By its conduct as set forth above, Defendants converted and misappropriated for its own use Plaintiff's property, fees, income, and property interest in her accounts and listings with clients without authorization from Plaintiff.

151.    As a result of Defendants' conversion, Plaintiff has suffered damages.

## **PRAYER FOR RELIEF**

Plaintiff respectfully requests relief from the Court as follows:

a. Certification of this case to proceed as a class action under Rule 23 of the
Federal Rules of Civil Procedure;

b. An award to the named Plaintiff and class Plaintiffs of unpaid premium
overtime compensation;

c. An award to the named Plaintiff and class Plaintiffs of all unpaid and
untimely paid wages under applicable Maine wage and hour laws;

d. An award to the named Plaintiff and class Plaintiffs of statutory double

and treble liquidated damages;

e. An award to Plaintiff of back pay and front pay, liquidated statutory

damages, compensatory damages, and punitive damages;

f. An award to the named Plaintiff and the class Plaintiffs of all reasonable

attorneys' fees and costs; and

g. Such other and further relief as this Court deems just and proper.

Dated: January 12, 2023

Respectfully Submitted,

　/s/ Peter Mancuso　　　　　　
Peter Mancuso, Esq., Bar No. 005521
Andrew Schmidt, Esq., Bar No. 005498
Borealis Law, PLLC
97 India St.
Portland, Maine 04101
(207) 619-0884
peter@maineworkerjustice.com


　/s/ Eric Uhl　　　　　　
Eric Uhl, Esq., Bar No. 007244
Richardson, Whitman, Large & Badger
465 Congress St., 9th Floor
Portland, ME, 04101
(207) 774-7474
euhl@rwlb.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will automatically send notice of such filing to all counsel of record.

Dated: January 12, 2023

                                                      /s/Peter Mancuso
Peter Mancuso
Borealis Law PLLC
97 India St.
Portland, Maine 04101
207-619-0884
Peter@MaineWorkerJustice.com

*Attorneys for the Plaintiffs*